UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

WILLARD JAMES HALL,

               Petitioner,

v.

F.W. HAWS, Warden

               Respondent.

)
)
)
)
)
)
)
)
)
)

Case No. 05-CV-0010-WQH(JMA)

**REPORT AND RECOMMENDATION TO CONDITIONALLY GRANT PETITION FOR WRIT OF HABEAS CORPUS**

I.    **INTRODUCTION**

      Willard James Hall (hereinafter "Hall"), a state prisoner proceeding with appointed counsel, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego Superior Court conviction in case number SCD148429 for first degree murder with the special circumstance of murder during the course of a robbery and use of a deadly weapon. The Court has considered Hall's First Amended Petition ("FAP"), Respondent's Answer and Memorandum of Points and Authorities in Support of Answer, Hall's Traverse, and all the supporting documents submitted by the parties. Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court

recommends that the Amended Petition be conditionally **GRANTED** as to Ground One and **DENIED** as to Ground Two.

## II.    FACTUAL BACKGROUND

The following statement of facts is taken from the California Court of Appeal Opinion, <u>People v. Hall</u>, No. D038857, slip op. (Cal. Ct. App. July 16, 2003). (Lodgment No. 10.) This Court gives deference to state court findings of fact and presumes them to be correct. Hall may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Parke v. Raley</u>, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including references properly drawn from such facts, are entitled to statutory presumption of correctness). The facts as found by the state appellate court are as follows:

Foth was a songwriter-musician who lived in San Francisco and ran a record store there (Rocket Records). Having grown up in San Diego, Foth had close friends here, including Grace Ko, Steve Poltz and Ken Horne. By the late 1990's, Rocket Records' business began to decline; Foth began to experience financial problems and by 1999 had started using crack cocaine and "hanging around" with prostitutes. (All further dates are in 1999 except as otherwise noted.) After Ko became aware of Foth's problems, she convinced him to come to San Diego for a couple of months to stay with her and try to get his life back in order. In early September, Foth moved into Ko's home in Mission Hills; he was depressed and slept a lot.

On the afternoon of Wednesday, September 29, Ko and Foth drove to the Oceanside home of Louis and Christine Mello.  Ko and Christine went shopping; Foth planned to spend time with Louis, visit some other friends and then return to Ko's house to pick up Horne to join Ko and the Mellos for dinner at a Chevy's restaurant in Carmel Mountain Ranch. Ko left the keys to her car, a black Audi A4, and her cell phone with Foth, as well as her Visa card so that Foth could put some gasoline in the car.

Foth visited with Louis until sometime between 1:30 and 2:00 p.m. and then drove to Poltz's apartment.  Although Foth professed that he was not using drugs anymore, Poltz declined to give Foth any money because he was unconvinced by Foth's statements, in part because Foth had spent a night away from Ko's home in the first week after his arrival in San Diego and lied to his friends about where he was. Poltz offered, however, to pay for Foth to see a therapist he knew to help Foth deal with his problems. Foth told Poltz that he would think about it, but was antsy because he wanted to "get laid."  While Foth was with Poltz, he called a couple of women with whom he had

been sexually intimate in the past.  Foth left Poltz's apartment about 5:30 p.m. Foth was wearing faded black Levi's, a black T-shirt, Doc Marten wingtip shoes and a cheap plastic watch.

After Foth arrived back at Ko's house, he spoke on the phone with Horne, saying that he was going to see another friend to borrow some money but would be back. Foth had not returned by the time Horne arrived but had left a note.  At 6:50 p.m. (according to cell phone records), Horne called Ko's cell phone, expecting to reach Ko, but Foth answered and told Horne that he would be back "in a bit." It sounded like Foth was driving at the time. After 15 minutes passed, Horne tried the cell phone again, but got no answer.

Ko and the others waited for Foth to arrive at Chevy's and, by 7:00 p.m., she became concerned about where Foth was. Ko called her cell phone number every 10 minutes or so for the rest of the evening but only got the voice mail. Someone unsuccessfully attempted to use Foth's ATM card at 8:56 p.m. and someone used Ko's cell phone [at 11:46 p.m.] to call a pager owned by Michael Washington, a friend of Sherrors' and Hall's.

In the late afternoon of September 30, a worker at the Pinery Tree Farms discovered Foth's naked body in a brushy area near a work site on Highland Valley Road and pointed it out to his manager, Laurence Prindle. Although Prindle had come by the site several times that day, he had not seen the body earlier. Prindle called 911.  Responding officers determined that Foth was dead and found a number of items at the scene, including a shirt, a pair of size eight sneakers, a Seiko wristwatch with a metal face, a broken fingernail and a pair of bloodstained white socks.  They also found a circular bloodstain, one foot in diameter and two inches deep, near the fence and marks on the ground leading from the stain to the place where they found Foth's body, suggesting that the body had been dragged. They also found a shoe print in the soil.

An autopsy showed that Foth, who was six feet, one-half inch tall and weighed 183 pounds, had bled to death.  The body had approximately 83 stab wounds, many of which were in the upper chest and neck area, as well as abrasions on the back, defensive wounds to the right hand and wrist and a blunt force trauma to the head.  It also had streaks of seminal fluid across the right thigh, an occurrence that is not unusual for a male homicide victim and that did not necessarily indicate the victim had been engaged in sex. The body tested negative for the presence of drugs.

On October 9, Lena Hixon told her close friend, Eric Bazile, that she had witnessed "something . . . pretty bad" and that two guys had threatened her life. Bazile and his friend Shahyid told Hixon to call the police. Hixon refused, so Shahyid made the call. Hixon left Bazile's apartment and Shahyid followed her. The two argued, attracting the attention of the police, and Shahyid told the officers what Hixon had said. The officers arrested Hixon, who was carrying a razor blade.

Hixon falsely told police that she had committed this crime with two men named Benjamin Wilson and Terrence Smallgreen and that Smallgreen had lost his watch and left his shirt at the scene.  A few days later, Hixon told Bazile that Sherrors and Hall were involved in the murder and asked Bazile to notify the police.  Hixon repeated her statements in her subsequent police interview.

At trial of the charges against Sherrors and Hall, Hixon testified as follows:

In the late afternoon or early evening of September 29, Foth approached Hixon near University and Euclid Avenues and asked if she knew where to buy some rock cocaine.  Although Hixon initially hesitated because she suspected that Foth was an undercover agent, she ultimately told him she knew where to get some; they drove in Ko's Audi to an apartment on Wightman Street, where Sherrors and Hall were living.  At the time, Sherrors, Hall and Hixon were handling drug sales for Hixon's boyfriend, Michael Washington.

When Hixon whistled loudly, Hall and Sherrors came out of the apartment. Hixon told Sherrors that Foth was looking for cocaine and Sherrors spoke briefly to Foth, who was still sitting in the car.  Sherrors and Hall got into the vehicle with Foth. Sherrors told Hixon they would be right back and the three men drove off.

After 15 to 20 minutes, Sherrors drove up in the Audi with Hall sitting in the back seat; Foth did not appear to be with them. Sherrors and Hall told Hixon that they had "hooked [Foth] up" and he was letting them use the car in exchange for drugs, a practice that is not uncommon for drug dealers.  Sherrors told Hixon to get in the car to go smoke some "weed" and Hixon complied.

Sherrors initially had difficulty driving with the car's stick shift but seemed to have it figured out by the time he got onto the I-15 freeway.  After awhile, Hixon became concerned because it was unusual for a dealer to keep a customer's car for that period of time; Sherrors responded by explaining that he and Hall had robbed Foth, but Hixon thought he was kidding.

They continued to drive north until they neared Lake Hodges and exited the freeway onto a dark street.  Sherrors parked the car in a dirt lot, told Hixon to stay there and said he and Hall would be right back.  The men opened the trunk and Foth climbed out.  Foth was clothed, but he was holding his hands as if they were tied.  Hixon got out of the car and demanded to know what was happening; Sherrors grabbed her hands, breaking two of her acrylic fingernails. Sherrors told Hixon to "shut the f--- up" and threatened to kill her and everybody she knew.

Sherrors turned back toward Hall and Foth, who were tussling, and started to stab Foth.  Foth did not appear to put up a fight

4

but merely said, "Let me die." Sherrors continued to stab Foth for several minutes and then walked back to Hixon with the knife and told her to stab Foth. Hixon initially refused, but stabbed Foth once after Sherrors insisted they were not going to just let her walk away; according to her testimony, Hixon believed that Foth was already dead. Sherrors and Hall stripped Foth and threw his body into the bushes. Hall put Foth's clothes into the trunk and Sherrors, Hall and Hixon got into the Audi. Sherrors was wearing a different shirt than he had on earlier.

With Sherrors at the wheel, the threesome got back onto the freeway and headed southbound.  At some point, Sherrors muttered that he had dropped his watch at the scene.  They drove for about five or 10 minutes and got off the freeway to stop at an AM PM convenience store/gas station.  Hall purchased some cigarettes at the store and attempted unsuccessfully to use Foth's ATM card. (Although Hall had used the correct PIN number for Foth's account, the bank had "frozen" the account six days earlier.)  Sherrors and Hall dropped Hixon off at a liquor store at University and Euclid Avenues.  Sherrors held up a picture of Hixon's five-year-old daughter and said, "She's growing up to be real pretty.  I think you'd like to keep it that way."

In addition to Hixon's testimony, the prosecution introduced evidence of the following:

Sherrors eventually returned to the Wightman Avenue apartment, wearing his sister's "old laundry shirt" inside out and backwards.  There were blood marks on the front side of the shirt (as worn normally) and a significant amount of blood on Sherrors' white Fila tennis shoes.  Sherrors later left the apartment with a bag and, when asked where he was going, responded, "Don't worry about it."  He was wearing gray Nike shoes at the time.  Sherrors' sister never saw her shirt again.

Shortly after Sherrors left the apartment, a neighbor called the fire department because her downstairs unit at the same complex was filled with smoke that smelled of burnt plastic.  She directed the responding firefighters to the complex's dumpster area, where they found a smoldering pile of debris.  The firefighters stomped out the remains of the fire.

Sherrors and Hall kept the car for several days, claiming it belonged to Hixon's mother.  On October 2, the men saw a newscast regarding the murder that mentioned the car and, early the next morning, the car burned in a fire as it sat in a nearby alley.  After the fire was extinguished, police inspected the car, but did not find any of the defendants' fingerprints on the car exterior or any detectable bloodstains in the trunk.

On October 14, police searched the Wightman apartment and arrested Sherrors, Hall and Jimmie Washington.  They took saliva, blood and other samples from Sherrors, Hall and Jimmie.  They found Foth's high school class ring in a pair of Hall's pants and found Michael Washington's pager number in

5

Sherrors' pocket.  They ultimately re-arrested Hixon, who was charged with Sherrors and Hall for Foth's murder.

While Hixon was being held at the Los Colinas Women's Detention Center, she spoke several times to inmate Kathrine Davis about the incident. Hixon told Davis that she had approached Foth to see if he wanted her services as a prostitute and that she, Sherrors and Hall had robbed Foth and killed him. Hixon also told Davis that although she did not initially realize that Foth was in the trunk of the Audi, she found that out as the three were driving north.  She indicated to Davis that she stabbed Foth several times and held him down as Sherrors and Hall stabbed him. Hixon said that "her old man" had destroyed the shoes she wore on the night of Foth's murder and that her clothes from that night were burned in the car.  Hixon was hesitant to testify against Hall, who was an old friend, and she was also concerned about her safety as a result of threats Sherrors had made against her.

In November, Michael Washington stored some items at the house of Mikiisha Perine.  Several months' later, when Perine was preparing to move, she looked through the items and found a blue purse containing Hixon's social security card, Ko's Visa and Costco cards, Foth's ATM card and three of Foth's business cards.  Perine called Ko, who alerted the police.

Hixon entered into a plea agreement with prosecutors in which she agreed to plead guilty to conspiracy to sell cocaine and assault with a deadly weapon and to testify truthfully in these criminal proceedings against Sherrors and Hall. In accordance with the agreement, the court sentenced Hixon to 12 years in prison.

(Lodgment No. 10 at 2-9.) Sherrors and Hall were tried as co-defendants in

San Diego Superior Court Case No. SCD148429.

Counsel for Sherrors and Hall responded to the prosecution's evidence by attacking Hixon's credibility through evidence that she was a prostitute and drug user, had changed her story about the events of the evening in question, had made statements to Katherine Davis indicating that she had significant involvement in the murder, had lied in saying that she never used Ko's cell phone and had not been in the Audi at all after Sherrors and Hall dropped her off.  Defense counsel also argued that it was not possible for the events of September 29 to have happened as Hixon testified.

(Lodgment No. 10 at 9.)

/ /

/ /

### III.   PROCEDURAL BACKGROUND

On June 7, 2001, a jury found Hall and Sherrors guilty of first degree murder while using a deadly weapon and with the special circumstance of murder during a robbery, in violation of Cal. Penal Code §§ 187, 190.2(a)(17), and 12022(b). (Doc. No. 5 at 2; Doc. No. 55-2 at 1; Lodgment No. 10 at 9.) On September 28, 2001, the trial court sentenced Hall to life without the possibility of parole, plus one year. (Id.; Id. at 9-10.)

Hall and Sherrors appealed to the California Court of Appeal, Fourth Appellate District, Division One. (See Lodgment No. 5 and 6.) On July 16, 2003, the appellate court affirmed the convictions in an unpublished decision. (Doc. No. 5 at 3; Lodgment No. 10.) Hall and Sherrors thereafter each filed a Petition for Review in the California Supreme Court. (Id.; Lodgment No. 11 and 12.) The California Supreme Court denied the Petitions for Review without comment on October 1, 2003. (Id.; Lodgment No. 13.)

On January 3, 2005, Hall, proceeding pro se, filed a federal Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. §2254, challenging his conviction. (Doc. No. 1.) On March 15, 2005, Hall filed the FAP, claiming the trial court committed constitutional error by: (1) improperly modifying California Jury Instruction ("CALJIC") No. 2.15; (2) improperly modifying CALJIC No. 8.81.17; and (3) presenting the jury with incomplete verdict forms. (Doc. No. 5 at 6-9; Doc. No. 53 at 1.)

On June 15, 2005, Respondent filed a Motion to Dismiss on the grounds that Hall had failed to exhaust state remedies as to his claim regarding CALJIC No. 8.81.17. (Doc. No. 9; Doc. No. 10.) On August 11, 2005, Hall filed a Motion for Stay and Abeyance, requesting that the court stay his case so he could present his unexhausted claim in state court. (Doc. No. 15.) On September 16, 2005, this Court issued a Report and

Recommendation to the District Court, recommending that the court deny the Motion for Stay and Abeyance on the grounds that Hall had failed to demonstrate good cause for failing to exhaust his second claim. (Doc. No. 16.) No objections were filed to the Report and Recommendation, and on January 24, 2006, the District Court adopted the Report and Recommendation in its entirety, and informed Hall of his options to either "voluntarily dismiss his entire federal petition and return to state court to exhaust his unexhausted claims," or "formally abandon his unexhausted claim and proceed with his exhausted claims." (Doc. No. 17 at 3-4.) The court stated that if Hall chose the second option, he had thirty (30) days to file a pleading entitled "Formal Abandonment of Unexhausted Claim." (Id.)

On February 28, 2006, Hall filed an "Application for Extension of Time to File Motion to Formally Abandon Unexhausted Claim," indicating his intention to abandon the unexhausted second claim and proceed with his remaining exhausted claims. (Doc. No. 18 at 1.) On March 27, 2006, this Court granted Hall's request for additional time, and ordered that Hall had until April 24, 2006, to file his "Formal Abandonment for Unexhausted Claim." (Doc. No. 19 at 2-3.) Thereafter, Hall did not file a formal abandonment of unexhausted claim or any other filing in response.

On May 19, 2006, the District Court issued an Order finding Hall "filed a mixed Petition, has been given two options, but has failed to proceed under either option given by [the] Court." (Doc. No. 20 at 2-3.) The District Court ordered that Hall's habeas corpus petition be dismissed "without prejudice." (Id. at 4.)

Meanwhile, on June 20, 2005, Sherrors also filed a federal Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his conviction. (Case No. 05cv1262-IEG-LSP, Doc. No. 1.) In his petition, Sherrors asserted the same claim regarding CALJIC No. 2.15 that Hall

asserted in his petition (Id. at 14) On May 24, 2007, U.S. Magistrate Judge Leo S. Papas issued a Report and Recommendation recommending the District Court conditionally grant Sherrors' petition on the grounds that the trial court's use of CALJIC No. 2.15 constituted prejudicial constitutional error. (Id.) On November 2, 2007, U.S. District Judge Irma E. Gonzalez adopted the Report and Recommendation, "conditionally granting the writ unless the State decides to retry [Sherrors] within a reasonable time." (Id.) On November 15, 2007, the Respondent in Sherrors' case appealed Judge Gonzalez's decision to the Ninth Circuit (Ninth Circuit Case No. 07-56756). (Id.)

Thereafter, on May 18, 2009, Hall filed a "Motion to Join the Case of Co-Defendant," Hall's first filing in this case since his request for an extension of time on February 28, 2006. (Doc. No. 18; Doc. No. 26.) The District Court treated the filing as a motion to reopen Hall's habeas corpus petition and proceed on the exhausted first and third claims for relief. (Doc. No. 27.) Hall stated that the circumstances of his case "mirror that of Sherrors from arraignment until they split in federal habeas corpus petitions...Petitioner [Hall] suffered the exact same damning testimony, the exact same sentence and their appeals throughout the state courts (laying the foundation for the federal claims) were and are exactly the same." (Doc. No. 26 at 16.) Hall alleged that his due process rights were violated by the trial court's use of CALJIC No. 2.15, and requested "relief under 28 U.S.C. § 2254, parallel to that of his co-defendant Sherrors." (Id. at 15, 18.)

On October 9, 2009, the District Court denied the motion "without prejudice to refile...once the Court of Appeals for the Ninth Circuit issues a final decision in Sherrors' habeas case." (Doc. No. 33 at 6.) The District Court ordered Respondent "to file in this action and serve on Hall a copy of any final decision issued by the Ninth Circuit in Sherrors' habeas case,"

and stated that "Petitioner [Hall] may refile his motion to reopen this case no later than sixty (60) days after he is served with a copy of the Ninth Circuit's final decision in Sherrors' habeas case." (Id.)

On August 31, 2011, Respondent filed in this action and served on Hall a copy of the Ninth Circuit's decision in Sherrors' case, which affirmed Judge Gonzalez's decision granting Sherrors a conditional writ of habeas corpus on his claim regarding CALJIC No. 2.15. (Doc. No. 39, 39-1 at 9.) Hall thereafter mailed the District Court a "Motion to Join the Case of Co-Defendant" and "Motion to Re-Open Case." (Doc. No. 41.) In the motion, Hall stated that after the District Court dismissed Hall's FAP, Sherrors "continued to advise Hall via intermittent third-party communications that he was filing 'Writs and Motions' with Hall's name included as a co-submission." (Id. at 3.) Hall stated that "due to the intermittent third-party communications Hall received from Sherrors, Hall had good faith reason to believe his interests were included in any outcome of [Sherrors' case]." (Id. at 4.) Hall further stated that "throughout the state court [process,] counsel for both co-defendants used this language of joinder to ensure that both defendants benefitted from any success throughout their appeals," and that "Petitioner [Hall] relied on Sherrors to continue to include his name as a co-submitter." (Id.) Hall asserted that "[c]onsidering the Ninth Circuit's affirmation of the district court's reversal of Sherror[s]'[] [conviction], Hall's joint conviction is a gross miscarriage of justice." (Id. at 6.)

On May 22, 2012, the District Court found "the appointment of counsel is appropriate in this matter, as a denial of Hall's motion under Rule 60(b) may raise significant due process issues." (Doc. No. 49 at 5.) On June 22, 2012, Hall, with the assistance of appointed counsel, filed a supplemental Motion for Relief under Rule 60(b). (Doc. No. 50.) On August 31, 2012, the District Court granted Rule 60(b)(6) relief to Hall, ordering

Hall's case to be reopened so the case could proceed on Hall's exhausted first and third claims for relief. (Doc. No. 53 at 10.) Respondent filed an Answer to the FAP on November 15, 2012. (Doc. No. 55.) Hall filed a Traverse on December 27, 2012. (Doc. No. 61.)

## IV.   DISCUSSION

### A.   Scope of Review

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a). Accordingly, a federal habeas corpus petition must allege a deprivation of a federal right to present a cognizable claim pursuant to § 2254; a state's interpretation of its laws or rules provides no basis for federal habeas corpus relief when no federal constitutional question arises. Id.; Estelle v. McGuire, 502 U.S. 62, 68 (1991).

The current petition is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320 (1997). As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). For the purposes of § 2254(d), a state court has decided a constitutional claim on the merits "when it has decided the petitioner's right to post conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits." Lambert v. Blodgett, 393 F.3d 943, 969 (2004). An unexplained denial of a habeas petition by the California Supreme Court is an adjudication on the merits of the claims, and is entitled to AEDPA deference. Harrington v. Richter, 131 S.Ct. 770, 785 (2011). When a state court issues a decision without separately addressing a federal claim, the presumption is that the federal claim was adjudicated on the merits, though the presumption is rebuttable "in some limited circumstances." Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013).

To obtain federal habeas relief, Hall must satisfy either § 2254(d)(1) or § 2254(d)(2).  See Williams v. Taylor, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13; see Lockyer v. Andrade, 538 U.S. 63, 73-76 (2003). State court rulings are given a "highly deferential standard" such that decisions made by state courts are "given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision.  Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991).  If the dispositive state court

1  order does not provide a reasoned decision, federal habeas courts must
2  conduct an independent review of the record to determine whether the
3  state court's decision is contrary to, or an unreasonable application of,
4  clearly established Supreme Court law.  See Delgado v. Lewis, 223 F.3d
5  976, 982 (9th Cir. 2000) (overruled on other grounds by Lockyer, 538 U.S.
6  at 75-76); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).
7  However, a state court need not cite Supreme Court precedent when
8  resolving a habeas corpus claim.  Early v. Packer, 537 U.S. 3, 8 (2002).
9  "[S]o long as neither the reasoning nor the result of the state-court decision
10  contradicts [Supreme Court precedent,]" the state court decision will not be
11  "contrary to" clearly established federal law.  Id.

**B.  Analysis**

13  Hall raises two properly exhausted grounds for relief in his petition. In
14  Ground One, Hall alleges the trial court erred when it instructed the jury
15  with a modified version of CALJIC No. 2.15. (Doc. No. 5 at 6.) In Ground
16  Three, Hall contends the trial court erred in providing the jury with a
17  defective verdict form. (Id. at 9.)

**1.  Ground One**

19  Hall alleges he was denied due process of law when the trial court
20  instructed the jury with a modified version of CALJIC No. 2.15, allowing the
21  jury to find a guilty verdict on a murder charge based upon a finding of
22  possession of stolen property. (Doc. No. 5 at 6.) Hall claims this
23  modification invited the jurors to draw an inference favorable to the
24  prosecution, thereby misleading the jury as to the prosecution's burden of
25  proof. (Id.)

26  To the extent Hall claims the jury instructions were incorrect under
27  state law, his claim is not cognizable on federal habeas review. Estelle, 502
28  U.S. at 71-72. To merit relief, clearly established Federal law dictates that a

petitioner must show the instructional error "so infected the entire trial that the resulting conviction violated due process." Id. at 72 (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973). The allegedly erroneous instruction must be considered in the context of the entire trial record and the instructions as a whole. Id. Further, "it is not sufficient that the instruction is erroneous; rather the petitioner must establish that there was a reasonable likelihood that the jury applied the instruction in a way that violated a constitutional right. Carriger v. Lewis, 971 F.2d 329, 334 (9th Cir. 1992) (en banc) (citing Estelle, 502 U.S. at 72). Even if the court determines the instruction violated a petitioner's due process rights, a petitioner can only obtain relief if the unconstitutional instruction resulted in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993).

The trial court instructed the jury with a modified version of CALJIC No. 2.15, as follows:

"If you find that a defendant was in possession of recently stolen property, the fact of that possession is not by itself sufficient to prove an inference that the defendant is guilty of the crime of murder. Before guilt may be inferred, there must be corroborating evidence tending to prove a defendant's guilt. However, this corroborating evidence need only be slight and need not by itself be sufficient to warrant an inference of guilt.

"As corroboration, you may consider the attributes of possession, time, place and manner; that the defendant had an opportunity to commit the crime charged; the defendant's conduct; his false or contradictory statements, if any; and other statements that may have been made with reference to the property."

(Lodgment No. 10 at 10.) Hall contends this instruction lessened the prosecution's burden of proof. As mentioned above, the Ninth Circuit affirmed Judge Gonzalez's conditional grant of Sherrors' claim his due process rights were violated by the use of CALJIC No. 2.15 when he was

tried jointly with Hall.[1] <u>Sherrors v. Woodford</u>, 425 F. Appx. 617, 618-19 (9th Cir. 2011).

Hall raised this claim, regarding the impropriety of the use of a modified version of CALJIC No. 2.15, in his Petition for Review to the California Supreme Court, which denied the petition without comment. (Lodgment No. 13.) Accordingly, this court must "look through" to the last reasoned state court decision to address the claim. <u>Ylst</u>, 501 U.S. at 803-04. In denying Hall's claim, the state appellate court stated:

Hall contends, and Sherrors joins in the contention, that the trial court erred in instructing the jury with the modified instruction, arguing that corroborated evidence that he possessed property recently stolen from Foth supports only an inference that he committed theft, but does not permit an inference that he was guilty of murder.

The California Supreme Court's recent decision in *People v. Prieto* (2003) 30 Cal.4th 226 (*Prieto*) holds that CALJIC No. 2.15 is inapplicable to nontheft offenses, including murder. (*Prieto*, at pp. 248-249, *citing People v. Barker*, *supra*, 91 Cal.App.4th at p. 1176.) Although the Attorney General suggests that the analysis of *Prieto* does not apply in cases "where the murder is directly and causally related to and emanating from the same facts as the theft offense and the only issue is identity," the unequivocal language of *Prieto* does not support such a conclusion. Further, in light of the jury's special circumstance robbery-murder finding in *Prieto*, the opinion cannot be read as holding that the fact the murder emanates from the same facts as the theft renders its analysis inapplicable. In accordance with *Prieto*, we conclude that the court erred in instructing the jury with CALJIC No. 2.15.

(Lodgment No. 10 at 11.) Having found error, the court of appeal next considered whether the error in using CALJIC No. 2.15 was harmless. (<u>Id</u>.)

---

[1] Respondent contends the U.S. Supreme Court's grant of a writ of certiorari in <u>Williams v. Cavazos</u>, 646 F.3d 626, 635 (9th Cir. 2011), now <u>Johnson</u>, 133 S. Ct. 1088, may cast doubt on the propriety of the Ninth Circuit's analysis in <u>Sherrors</u>. (Doc. No. 55-2, pp. 1 and 7.) <u>Johnson</u>, however, does not vitiate the soundness of the Ninth Circuit's decision in <u>Sherrors</u>. The issue the Supreme Court considered in <u>Johnson</u> was whether a federal habeas petitioner's claim had been adjudicated on the merits by the state court when the state court denied relief in an explained decision, but did not expressly acknowledge a federal law basis for the claim. As discussed in more detail in this section, in <u>Sherrors</u>, by contrast, the Ninth Circuit determined the California Court of Appeal erred in not recognizing the use of CALJIC 2.15 was an error of constitutional magnitude, and that its resulting application of the incorrect harmless error standard was an unreasonable application of clearly established Federal law.

There are two standards applied by California courts in determining whether an error is harmless. The standard used to review "non-constitutional magnitude, trial type errors" requires a reviewing court to determine whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." People v. Watson, 46 Cal. 2d 818, 836 (1956). In contrast, the standard used to review errors of constitutional magnitude under the clearly-established federal standard requires a reviewing court to decide whether the error was "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967).

In this case, the court of appeal concluded that the error in instructing the jury as to the modified CALJIC No. 2.15 did not make it "reasonably likely the jury would have reached a different result if the court had not given the instruction." (Lodgment No. 10 at 11.) Specifically, the appellate court stated:

> The question then becomes whether the error is prejudicial, i.e., whether it is reasonably likely the jury would have reached a different result if the court had not given the instruction. (*Prieto*, *supra*, 30 Cal.4th at p. 249.)  We answer this question in the negative.  CALJIC No. 2.15 specifically instructed the jurors that they could not infer guilt of murder from the defendants' possession of recently stolen property absent corroborating evidence of guilt.  The inference of guilt addressed in CALJIC No. 2.15 is permissive, not mandatory, and thus the jury was entitled to credit, or reject, the inference based on its evaluation of the evidence. (*People v. Anderson* (1989) 210 Cal.App.3d 414, 430.)  The court also instructed the jury on the elements of murder, felony murder and the special circumstance of murder during the commission of a robbery, and told the jurors that the prosecution had to prove these elements and the special circumstance beyond a reasonable doubt.  Most notably, the jury's special circumstance finding that the defendants committed the murder during the commission of a robbery makes clear that the jury accepted the substance of Hixon's testimony regarding the defendants' involvement in the incident.  Based on the jury's acceptance of Hixon's testimony, there is no reasonable likelihood that it would have rendered a verdict more favorable to the defendants had the court omitted this instruction.

(Lodgment No. 10 at 11-12.) Thus, the court of appeal did not find the error to be of constitutional magnitude, and accordingly applied the harmless error standard set forth in Watson. 46 Cal. 2d at 836; see Bains v.Cambra, 204 F.3d 964, 971 (9th Cir. 2000) (finding that, "by applying the Watson harmless error standard rather than the Chapman standard, [the state court] impliedly found the [error] was not an error of constitutional magnitude.")

As explained in Sherrors and below, the use of CALJIC No. 2.15 in Hall and Sherrors' trial was an error of constitutional magnitude. See Sherrors, 425 F. Appx. at 619. CALJIC No. 2.15 permits the jury to draw a permissive inference, meaning the jury could (but was not required to) infer that Hall killed Foth based on: 1) Hall's possession of Foth's ring, plus 2) "slight" corroborating evidence. Id. A permissive inference is one in which the jury is allowed, but is not required, to infer a specified conclusion if the prosecution proves certain predicate facts. Schwendeman v. Wallenstein, 971 F.2d 313, 315-316 (9th Cir. 1992). A permissive inference in jury instructions is constitutional where "it can be said 'with substantial assurance' that the inferred fact is 'more likely than not to flow from the proved fact on which it is made to depend.'" Id. at 316 (citing United States v. Rubio-Villareal, 967 F.2d 294, 296 (9th Cir. 1992)).

In People v. Prieto, which was issued after Hall's and Sherrors' convictions, but before the California Court of Appeal considered their joint direct appeal, the California Supreme Court held the use of CALJIC No. 2.15 in nontheft offenses, such as rape or murder, is improper. 30 Cal. 4th at 248. In that case, the court explained that a suspect's "knowledge and conscious possession of [stolen] property" is strong evidence of a theft offense, logically flowing from possession of stolen goods, though "the same is not true for nontheft offenses like rape or murder." Id. at 249 (citing

Barker, 91 Cal. App. 4th at 1176). Although in <u>Prieto</u> the California
Supreme Court did not discuss the federal due process implications of
using CALJIC 2.15, it observed "'[p]roof [that] a defendant was in conscious
possession of recently stolen property simply does not lead naturally and
logically to the conclusion the defendant committed' a rape or murder." 30
Cal. 4th 226, 249 (2003) (<u>citing</u> <u>People v. Barker</u>, 91 Cal. App. 4th 1166,
1176 (2001)). In <u>Sherrors</u>, the Ninth Circuit adopted this reasoning in
concluding Sherrors' right to due process was violated when the jury was
instructed it could presume Sherrors murdered Foth based on the fact
Sherrors was found in possession of Foth's automobile, plus "slight
corroborating evidence," because the presumed fact does not follow from
the facts established. <u>Sherrors</u>, 425 F. Appx. at 619. Similarly, the inferred
fact here, Foth's murder, is not more likely than not to flow from Hall's
possession of Foth's stolen property, a ring police found in a pair of Hall's
pants. (Lodgment No. 10 at 8.) Based on Hall's possession of Foth's ring,
and in conjunction with Hixon's inconsistent testimony, the prosecution
asked the jury to infer that Hall murdered Foth. (<u>Id</u>. at 9.) This inference
does not pass constitutional muster, as it cannot be said "with substantial
assurance" that the inferred fact, murder, is "more likely than not to flow
from the proved fact on which it is made to depend," i.e., finding of Foth's
ring in Hall's possession. Accordingly, this Court finds that the use of
CALJIC No. 2.15 in Hall's murder case was an error of constitutional
magnitude.

The state appellate court, however, did not find the error to be of
constitutional magnitude, and accordingly applied the harmless error
standard set forth in <u>Watson</u>. <u>See</u> <u>Bains v.Cambra</u>, 204 F.3d 964, 971 (9th
Cir. 2000) (finding that, "by applying the <u>Watson</u> harmless error standard
rather than the <u>Chapman</u> standard, [the state court] impliedly found the

[error] was not an error of constitutional magnitude.") Thus, although the court of appeal found error, it "failed to select the appropriate standard in evaluating the harmlessness" of the error. Id. at 975.

Due to the appellate court's erroneous use of the Watson standard, where the Chapman standard should have been applied due to the constitutional magnitude of the trial court's instructional error, the court of appeal's decision amounted to an unreasonable application of clearly established Federal law. See 28 U.S.C. § 2254(d); Bains, 204 F.3d at 971; Williams, 529 U.S. at 412-13. See also, Sherrors, 425 F. Appx. at 619 (finding the California Court of Appeal's failure to recognize the instructional error was of constitutional magnitude amounts to an unreasonable application of clearly established Supreme Court law.)

Irrespective of whether the state courts have analyzed a constitutional error for harmlessness under Chapman, federal district courts on § 2254 habeas review must analyze harmlessness under the standard set forth in Brecht, 507 U.S. 619, 637 (1993).  See Fry v. Pliler, 551 U.S. 112, 127 S.Ct. 2321, 2328 (2007) (stating that, "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman," a federal habeas court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in" Brecht. 507 U.S. at 637-38; see also Bains, 204 F.3d at 977 (holding that the federal court "should apply the Brecht standard when conducting their own independent harmless error review, regardless of what, if any, type of harmless error review was conducted by the state courts"). Therefore, the Court must now decide whether the unconstitutional instruction had a substantial influence on the conviction, thereby resulting in "actual prejudice." Brecht, 507 U.S. at 638-

38. Under Brecht, actual prejudice exists if the unconstitutional instruction "had [a]  substantial and injurious effect or influence in determining the jury's verdict." Id. (citing Kotteakos v.United States, 328 U.S. 750, 776 (1946)).

In determining whether there was a Brecht error, a judge must consider, "'Do I, the judge, think that the error substantially influenced the jury's decision?'" O'Neal v. McAninch, 513 U.S. 432, 436 (1995). If a federal habeas judge is in "grave doubt" about whether a constitutional trial error "had [a] substantial and injurious effect or influence in determining the jury's verdict," the error is not harmless and the "petitioner must win." O'Neal, 513 U.S. at 436, 445.

Here, the Court is in "grave doubt" the error was not harmless. After reviewing all the evidence presented at trial, the Court cannot say that the instruction did not have a "substantial and injurious effect or influence in determining the jury's verdict." As observed in Sherrors, the prosecution's case relied overwhelmingly on the testimony of Hixon, an accomplice whose statements under oath were inconsistent and were contradicted by objective evidence at trial. Sherrors, 425 F. Appx. at 620. Hixon admitted to having lied numerous times about the identity of the murderers and the circumstances of the incident. She first told detectives that the killers were Ben Wilson and Terrence Smallgreen, then changed her story and reported that the murderers were actually Hall and Sherrors. (Lodgment No. 3 at 984, 986-87, 1019, 1021.) She also told detectives Foth approached her for rock cocaine, but while incarcerated at the Las Colinas Women's Detention Center, she told a fellow inmate, Kathrine Davis, that Foth had approached Hixon for sex. (Id. at 1023, 1024-25.) Hixon testified the shirt found at the crime scene belonged to Sherrors, but DNA testing eliminated Sherrors, Hall and Hixon, as the habitual wearer of the shirt. (Id. at 1032-33, 1146-

47, 1273-75, 1524.)

Although Hixon initially denied stabbing Foth, after being pressed by detectives, she changed her story and confessed that she stabbed Foth one time to placate Sherrors's demand to do so. (Id. at 965-66, 1120, 1133-37.) When she described the stabbing to Davis, Hixon told her she used her shirt over the knife to avoid leaving fingerprints. (Id. at 1612-13.) Davis testified that Hixon told her she was surprised at how the knife felt as it went into the body. (Id. at 1613.)

Hixon also testified that she lost her fingernail as a result of Sherrors squeezing her hands with sufficient force to crack the fingernail when she exited the car after arriving at the pumpkin patch. (Id. at 970, 1022.) Hixon told Davis, however, that her she must have lost her fingernail while she was holding Foth down or helping drag his body. (Id. at 1610-11.)

Hixon's testimony was also in direct conflict with other, more objective evidence presented at trial. She denied ever seeing or using Foth's cell phone, but phone records showed that days after the murder, she used the phone to call one of her customers after she received a page from him. (Id. at 1036, 1671-86.) Hixon also testified that she never saw, took, or touched any of Foth's property, but her fingerprints were found on some of his belongings and other items from the car he drove. (Id. at 1036, 1567.) Her story was also contradicted by third-party witnesses who testified they saw Hixon in or around the Audi several times in the days after the murder. (Id. at 861, 868, 1040,1185-86, 1190.)

Furthermore, according to Hixon's testimony, the entire incident, starting from the time Foth approached her, and including when she met up with Sherrors and Hall, the drive from City Heights to Lake Hodges, Foth's stabbing, Foth's body being hidden, and the drive back down the interstate to the AM PM, took place in well over an hour and a half. (Id. at 944-77.)

However, Hixon's testimony is contradicted by the objective evidence that Foth's last cell phone conversation took place at 18:50, and the first failed attempt to use the ATM card occurred only forty-six (46) minutes later. (Id. at 227, 231-32, 714-17, 1283.) It is nearly impossible to believe the murder as she described it could have taken place in that short of a time period.[2]

Given the multiple contradictions in Hixon's testimony and her numerous changed stories, the jury could have chosen to disbelieve her entirely. Other than her testimony, the jury was left with very little to tie Hall to Foth's murder. The other evidence tying Hall to Foth was Hall's possession of Foth's high school class ring, which detectives found in a pair of Hall's pants. (Id. at 1403-04.) Additionally, several witnesses testified to seeing Hall in or near the Audi just days after the murder. (Id. at 752, 861, 891-93.) There was no compelling physical evidence. The evidence found at the scene, such as the bloody shirt, the Gatorade bottle, the shoe print, and size eight (8) shoes, could not be tied to Hall or his co-defendant, Sherrors.[3] (Id. at 431-32, 679-80, 687, 1462, 1521-25.)

Given the equivocal evidence tying Hall to the murder itself, the

---

[2]  The court of appeal was asked to take judicial notice that the distance from 4699 Wightman Street (where, according to Hixon's testimony, Sherrors and Hall picked up Foth) to the University Avenue freeway on-ramp to I-15 north is 1.24 miles.  The distance from the I-15 University Avenue on-ramp to the Pomerado Road exit is 21.78 miles and it is another .39 miles from the exit to the pumpkin patch where Foth's body was found.  In order to get back to the freeway from the murder scene, it is another .58 mile (with a stop sign and a traffic light). From the on-ramp of I-15 south to the Mira Mesa Boulevard exit is 10.11 miles, and it is another .43 miles from there to the AM/PM where the attempt was made to use the ATM card. This distance also included traffic signals. (See Lodgment No. 7 at 59-60 n.31.) After considering driving time, there would have been little time left for Hixon to have brought Foth from the taco shop to the Wightman Street address, to wait for Hall and Sherrors to return after leaving with Foth (with Foth now in the trunk), and for Hall and Sherrors to stab Foth 83 times, disrobe him and throw his body over a fence.

[3]  Both Hall and Sherrors wore size thirteen (13) shoes. (Lodgment No. 3 at 608-09, 616.) Melvin Kong, an expert for the prosecution, originally testified the show print was about twelve and one-half (12.5) inches long, corresponding to a man's size twelve (12) to thirteen and one-half (13.5), but then on cross-examination admitted his notes indicated the length of the print was actually twenty-eight and one-half (28.5) centimeters, corresponding to a man's shoe size of seven (7) to eight and one-half (8.5). (Id. at 612-616.)

erroneous instruction that permitted the jury to infer his guilt based on his possession of Foth's class ring, being seen in the Audi, and slight corroboration leaves this Court in "grave doubt" about its effect on the outcome of the trial. See O'Neal, 513 U.S. at 436. While the evidence tying Hall to the murder was based on questionable testimony, the evidence that he was in possession of Foth's class ring was strong. Accordingly, the jury had strong evidence that Hall was in possession of stolen property (the ring) and used the victim's car. Based on these facts, it is difficult to say that allowing the jury to use the strong evidence of possession of stolen property to infer murder, with only slight corroboration, did not affect the jury's verdict.

Moreover, the instruction defined "slight corroboration" as only "the attributes of possession, time, place and manner; that the defendant had an opportunity to commit the crime charged; the defendant's conduct; his false or contradictory statements, if any; and other statements that may have been made with reference to the property." (Lodgment No. 10 at 10.) Thus, the jury could have inferred that Hall committed the murder based on the "time, place and manner" of his possession, that is, based on the fact that he was found in possession of the ring and was seen near the Audi days after the murder.

After reviewing Hall's case, this Court is in "grave doubt" as to whether the violation of Hall's due process rights had a substantial and injurious effect or influence on the jury's decision. Accordingly, the Court finds that the error was not harmless, and that Hall's due process rights were violated when the trial court instructed the jury under CALJIC No. 2.15. The court of appeal's denial of this claim was an unreasonable application of clearly established Federal law. Therefore, Hall is entitled to relief as to his due process claim. Thus, this Court **RECOMMENDS** Hall's

Petition for Habeas Corpus be **GRANTED** as to Ground One for the above stated reasons.

### 2.   **Ground Three**

Hall alleges he was also denied due process of law when the trial court presented the jury with an erroneous verdict form. (Doc. No. 5 at 9.) Hall claims the felony murder special circumstance verdict form was defective because it only required the jury to find he committed the murder during the commission of a robbery, omitting the requisite finding that he committed the murder to facilitate the robbery. (Id.; Doc. No. 61 at 1-2.) The special verdict form the trial court gave the jury stated:

> "We, the jury in the above entitled case, find the special circumstance that the murder of STEVEN FOTH was committed by defendant WILLARD JAMES HALL while the said defendant was engaged in the commission and attempted commission of the crime of Robbery, in violation of Penal Code sections 211 or 212.5, within the meaning of Penal Code section 190.2(a)(17), to be ___(TRUE)___ ."

(Lodgment No. 1-2 at 297.)

Hall raised this claim regarding the erroneous verdict form in his Petition for Review to the California Supreme Court, and it was denied without comment. (Lodgment No. 13.) Accordingly, this court must "look through" to the last reasoned state court decision to address the claim, in this case, the California Court of Appeal. Ylst, 501 U.S. at 803-04.

In denying Hall's claim, the Court of Appeal stated:

> Hall contends that the felony murder special circumstance verdict form was defective because it only required the jury to make a finding that he committed Foth's murder during the commission of a robbery, but omitted the requisite finding that he committed the murder to advance the commission of the robbery or to facilitate escape therefrom or avoid detection.  Hall argues that this error was prejudicial because when taken in conjunction with the prosecutor's closing argument, the verdict form would convince the jury that there was no distinction between first degree felony murder and the felony-murder special circumstance.
>
> In light of the fact that the special verdict form was incomplete rather than an inaccurate statement of the law, it is not clear

whether Hall properly preserved this issue for appellate review as he did not raise any objection to the special verdict form in the proceedings below. However, even if we reach the merits of Hall's argument, we nonetheless reject his contention that the incompleteness of the special verdict form constitutes reversible error.

In criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to and governing the case. (*People v. Roberge* (2003) 29 Cal.4th 979, 988.) In accordance with this principle, it certainly is preferable that the elements of a special circumstance allegation be completely stated in the special verdict submitted to the jury, although there is a split of authority on whether the omission of an enhancement element from the verdict form is error. (*Compare People v. Chevalier* (1997) 60 Cal.App.4th 507, 513-516; *People v. Garcia* (1992) 3 Cal.App.4th 582, 586.)

Even if we assume, however, that it was error for the court to give the jury a correct but incomplete special verdict form, any such error was harmless. (*See People v. Wims*, supra, 10 Cal.4th at p. 314 [generally, a judgment may be overturned for an instructional error relating to special sentencing allegations only if it is reasonably probable the defendant would have received a more favorable result in the absence of the error]; *compare People v. Sengpadychith* (2001) 26 Cal.4th 316, 325-326 [failure to instruct on an element of a non-strike sentence enhancement provision that increases the penalty for the underlying crime "beyond the 'prescribed statutory maximum' "is reversible unless harmless beyond a reasonable doubt].)

Hall admits the court properly instructed the jury that the special circumstance allegation required a finding that he committed the murder to advance the commission of the robbery. He nonetheless argues that the improper special verdict form-when coupled with the prosecutor's passing comment that although the special circumstance allegation required a finding that the murder was committed during the robbery, "it's the same elements basically" as those required for felony murder-rises to the level of prejudicial error. However, in light of the propriety of the court's instruction regarding the omitted element and its general admonition that the jury must follow the instructions rather than counsel's arguments regarding the applicable law, we conclude it is not reasonably likely that the jury was misled by the incomplete special verdict form.

(Lodgment No. 10 at 18-20.)

Hall argues the special verdict form omitted an essential element of the special circumstance allegation because, per Penal Code § 190.2(a)(17), a jury must find (1) the murder was committed while a

1  defendant was engaged in the commission or attempted commission of the

2  crime of Robbery *and* (2) the murder was committed in order to carry out or

3  advance the commission of the crime of Robbery, or to facilitate the escape

4  therefrom, or to avoid detection. See Cal. Penal Code § 190.2(a)(17); see

5  also CALJIC No. 8.81.17. Petitioner argues the use of the defective verdict

6  form violated his right to due process, but offers no explanation as to how

7  the alleged error prejudiced his trial.

8       Although the Court of Appeal did not analyze the effect of the alleged

9  error under Chapman, this Court must review constitutional errors under

10  Brecht. See Fry, 551 U.S. at 127. As noted in the Court's discussion of

11  Ground One,  even if the special verdict form violated Hall's due process

12  rights, he can only obtain relief if the instruction resulted in "actual

13  prejudice." Brecht, 507 U.S. at, 637-38. Hall must establish it was

14  reasonably likely that the jury applied the instruction in a way that violated

15  his constitutional rights. Carriger, 971 F.2d at 334 (citing Estelle, 502 U.S.

16  at 72).The standard for assessing prejudice resulting from the use of an

17  allegedly defective verdict form is whether the form "so infected the entire

18  trial that the resulting conviction violates due process." Carriger, 971 F.2d

19  at 334 (citing Cupp, 414 U.S. at 147). The effect of the form "must be

20  considered in the context of the instructions as a whole and the trial

21  record." Estelle, 502 U.S. at 72 (citing Cupp, 414 at 147).

22       The trial court provided the following jury instruction (CALJIC No.

23  8.81.17) to the jury:

> To find that the special circumstance, referred to in these instructions
> as murder in the commission of Robbery is true, it must be proved:
>        1a. The murder was committed while a defendant was engaged
> in the commission or attempted commission of a Robbery in violation
> of Penal Code section 211; and
>        2. The murder was committed in order to carry out or advance
> the commission of the crime of Robbery or to facilitate the escape
> therefrom or to avoid detection. In other words, the special
> circumstance referred to in these instructions is not established if the

robbery was merely incidental to the commission of the murder. (Lodgment No. 1-2 at 276.) Here, in looking at the instructions as a whole, it is clear that the jury did receive the proper instruction as to the second part of the special circumstance under CALJIC No. 8.81.17, even though it was not included on the special verdict form. While it is true that the trial court erred in omitting a necessary portion on the verdict form, Hall has not shown this error is of constitutional magnitude, and that it infected the whole trial such that it violated his constitutional rights. See Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.") Accordingly, the appellate court's denial of Hall's claim on these grounds was neither contrary to, nor an unreasonable application of, clearly established Federal law. Thus, this Court **RECOMMENDS** Hall's Petition for Habeas Corpus be **DENIED** as to Ground Three for the above stated reasons.

## V.    CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to the Honorable William Q. Hayes, United States District Judge assigned to this case pursuant to the provisions of 28 U.S.C. § 636(b)(1).

For the reasons outlined above, it is hereby recommended that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered conditionally **GRANTING** the First Amended Petition unless the State decides to retry Hall within a reasonable time.

**IT IS ORDERED** that no later than **April 9, 2014**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **April 16, 2014**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED: March 25, 2014

_____
Jan M. Adler
U.S. Magistrate Judge

28